IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FOOD AND WATER WATCH<br>1616 P Street, NW, Suite 300<br>Washington, DC 20036, and<br><br>FRIENDS OF THE EARTH<br>1100 15th Street NW, 11th Floor<br>Washington, D.C. 20005<br><br>PLAINTIFFS,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY<br>1200 Pennsylvania Av., N.W.<br>Washington, DC 20460, and<br><br>LISA JACKSON, Administrator,<br>United States Environmental Protection Agency,<br>1200 Pennsylvania Av., N.W.<br>Washington, DC 20460<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs Food and Water Watch and Friends of the Earth hereby challenge the pollution trading provisions of the final action by the United States Environmental Protection Agency ("EPA") and EPA Administrator Lisa Jackson (collectively "Defendants") in establishing Total Maximum Daily Loads ("TMDLs") for nitrogen, phosphorus, and sediment for the Chesapeake Bay and its tributaries.

2.      A TMDL identifies the maximum amount of a pollutant that a waterway may receive and still meet water quality standards.

1

3.     EPA took final action on the Chesapeake Bay TMDLs via notice-and-comment rulemaking, co-signed by the Regional Administrators for EPA Regions 2 and 3 on December 29, 2010. *Clean Water Act Section 303(d): Notice for the Establishment of the Total Maximum Daily Load (TMDL) for the Chesapeake Bay*, 76 Fed. Reg. 549-550 (Jan. 5, 2011).

4.     The documents setting forth EPA's final action and rationale are hereinafter collectively referred to as the "Chesapeake Bay TMDL" or "the TMDL."

5.     The Chesapeake Bay TMDL authorizes a water pollution trading system and offset system that contravenes EPA's authority and duty under the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d)(1)(C), is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C), and violates notice and comment required by the Administrative Procedure Act, 5 U.S.C. § 553.

## PARTIES

6.     Plaintiff Food and Water Watch, incorporated in the District of Columbia, with its headquarters in Washington, D.C., is a non-profit organization that advocates for common sense policies that will result in healthy, safe food and access to safe and affordable drinking water. Food and Water Watch works to ensure the food, water and fish that people consume is safe, accessible and sustainably produced.  Food and Water Watch has more than seven thousand members in the six states and District of Columbia that comprise the Chesapeake Bay watershed. Water pollution trading is antithetical to the values and mission of Food and Water Watch.

7.     Plaintiff Friends of the Earth, Inc. is a national, non-profit environmental advocacy organization founded in 1969 and incorporated in the District of Columbia, with its headquarters in Washington, D.C.  Friends of the Earth's mission is to defend the environment and champion a healthy and just world.  Friends of the Earth seeks to change the perception of

the public, media, and policy makers, and to effect policy change with well-reasoned policy analysis and advocacy campaigns that describe what needs to be done, rather than what is seen as politically feasible or politically correct.  Friends of the Earth has more than 2,500 members residing in the six states and District of Columbia that comprise the Chesapeake Bay watershed. Water pollution trading in the Bay TMDL directly contradicts the goals and values of Friends of the Earth.

8.      Defendant EPA is the federal agency responsible for administering the CWA, including supervision of the states' actions under the CWA.  In the District of Columbia, EPA is the agency primarily responsible for administering permits under the National Pollutant Discharge Elimination System ("NPDES").  EPA headquarters are located in Washington, D.C.

9.      Defendant Lisa Jackson is the Administrator of the EPA.  She is charged with the supervision and management of all decisions and actions of that agency.  Ms. Jackson is being sued in her official capacity.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

11.      Declaratory judgment and such other relief as the Court may deem just and proper is available pursuant to 5 U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 2201 and 2202.

12.      Plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706.

13.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants' official residence is in the District of Columbia.

## FACTUAL AND STATUTORY BACKGROUND

**I.     Water Quality Conditions in the Chesapeake Bay**

14.     The Chesapeake Bay ("the Bay") is a body of water stretching from Havre de Grace, Maryland, to Norfolk, Virginia. TMDL at 2-1.

15.     The Bay is the largest estuary in the United States and one of the largest and most biologically productive estuaries in the world.  Exec. Order No. 13,508, 74 Fed. Reg. 23,099, 23,099 (May 12, 2009).

16.     The Chesapeake Bay's 64,000-square-mile watershed includes parts of six states—Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia—and the entirety of the District of Columbia.  TMDL at 2-1.

17.     The Bay contains more than 10,000 streams and rivers that eventually flow into the Bay. *Id.*

18.     In 2010, there were nearly 17 million people living in the Chesapeake Bay watershed.  TMDL at 2-4.

19.     Major pollutants of concern in the Chesapeake Bay include nutrients (namely, nitrogen and phosphorus) and sediments.  TMDL at 2-7.

20.     Nationwide, agriculture is the largest source of water pollution in the country, responsible for over 94,000 miles of river and stream impairment.  *See* A National Evaluation of the Clean Water Act Section 319 Program, US EPA, November 2011.

21.     Impaired waterways are those for which technology-based regulations and other required controls are not stringent enough to meet the water quality standards.

22.     Agriculture constitutes the largest single source of nitrogen, phosphorus and sediment loading to the Bay.

23.     Agriculture is responsible for approximately 44 percent of nitrogen and phosphorus loads and 65 percent of sediment loads delivered to the Bay.  TMDL at 4-29.

24.     A load refers to the total amount of nutrient or sediment entering the water during a given time, such as "tons of nitrogen per year."

25.     Because of the excesses caused in part by agricultural operations in nutrient and sediment loads, most of the Chesapeake Bay and its tidal waters are listed as impaired waterways for nitrogen, phosphorus and sediment under the CWA.  TMDL at ES-3.

26.     Excessive nutrients produce undesirable water quality conditions including excessive algal growth, low dissolved oxygen, and reduced water clarity.  TMDL at 2-7.

27.     Excessive sediment suspended in the water column impairs the ability of light to penetrate the water column, and carries other pollutants, such as *E. coli*, into the water column. *Id*.

28.     Adverse water quality conditions produced by excessive nutrients and sediment diminish the ability of the Chesapeake Bay to support healthy assemblages of aquatic wildlife and vegetation, and impair recreational use and enjoyment of the Chesapeake Bay and its tributaries.  *Id*.

29.     In 2003, and in subsequent amendments, EPA established water quality criteria for the Chesapeake Bay, which have been incorporated into the state water quality standards of several Bay watershed states.  TMDL 3-1, 3-2.

## II.     EPA's Approval of Trading in the Chesapeake Bay TMDLs

30.     On October 1, 2007, the states and EPA agreed that EPA would establish TMDLs for the Chesapeake Bay no later than May 1, 2011.  TMDL at 1-9.

31.     Additionally, EPA entered into a number of settlement agreements and consent decrees in the context of lawsuits filed by individuals and groups dedicated to the restoration of the Chesapeake Bay dating back to the late 1990s.  TMDL at ES-3.

32.     Under those agreements and decrees, EPA was obligated to complete TMDLs for the Chesapeake Bay and its tributaries by specified dates.  TMDL at 1-17 to 1-20.

33.     President Obama issued Executive Order 13508 on May 12, 2009, which directed the federal government to lead a renewed effort to restore and protect the Chesapeake Bay and its watershed.  TMDL at ES-4.

34.     "Despite extensive restoration efforts during the past 25 years, the TMDL was prompted by insufficient progress and continued poor water quality in the Chesapeake Bay and its tidal tributaries."  TMDL at ES-1.

35.     Under the CWA, EPA was required to adopt a TMDL.  See 33 U.S.C. § 1313(d)(1)(C).

## GENERAL ALLEGATIONS

36.     The CWA states that: "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."  33 U.S.C. § 1311.

37.     The CWA requires all states to adopt water quality standards consisting of the designated uses applicable to waters and water quality criteria based on those uses.  33 U.S.C. § 1313(c)(2)(A).

38.     The CWA recognizes two broad categories of pollution sources: point sources and nonpoint sources.

39.     "Point sources" are defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

40.     "Nonpoint sources" are diffuse sources of pollution not covered by the definition of "point source."  40 C.F.R. § 35.1605-4.

41.     The CWA requires point sources to achieve the technology-based pollution control standards set forth in 33 U.S.C. § 1311(b)(1)(A) and (B).

42.     Point sources were required to implement the "best available technology economically achievable" (BAT) to control their discharges by March 31, 1989.  33 U.S.C. § 1311(b)(2)(A).

43.     The CWA makes it illegal for point sources to discharge pollutants into waters of the United States except when done in accordance with a permit issued under the Act's National Pollutant Discharge Elimination System.  33 U.S.C. § 1342.

44.     The NPDES requires new pollutant discharge permits to be issued every 5 years.

45.     New BAT control capabilities must be included in the new permits.  33 U.S.C. § 1311(d).

46.     In addition to point sources' BAT controls, the CWA mandates more stringent limitations when necessary to meet "water quality standards, treatment standards, or schedules of compliance" established pursuant to any Federal or State law or regulations, or when they are required to implement any applicable water quality standard established pursuant to the CWA. 33 U.S.C. § 1311(b)(1)(C).

47.     These water quality-based effluent limitations (WQBELs) become enforceable parts of the NPDES permit when necessary to protect waterways.

48.     The CWA authorizes states to adopt programs for issuing permits to point sources under the Act's NPDES.  33 U.S.C. § 1342(b).

49.     Any such state permitting program must be administered in accordance with regulatory guidelines promulgated by the EPA Administrator, pursuant to 33 U.S.C. § 1342(c)(2), currently codified in Parts 122 and 123 of Title 40, Code of Federal Regulations.

50.     The states or, failing that, EPA must identify those waters for which the technology-based pollution controls set forth in 33 U.S.C. § 1311(b)(1)(A) and (B) are not stringent enough to implement any applicable water quality standard.  33 U.S.C. § 1313(d)(1)(A).

51.     For such waters, the states (or EPA) must establish the "total maximum daily load" of pollutants, which "shall be established at a level necessary to implement the applicable water quality standards."  33 U.S.C. § 1313(d)(1)(C).

52.     EPA's CWA implementing regulations define "total maximum daily load" as "[t]he sum of the individual [wasteload allocations] for point sources and . . . [load allocations] for non-point sources and natural background."  40 C.F.R. § 130.2(i).

53.     A TMDL specifies the maximum amount or "load" of a pollutant that can be discharged into the waters from all sources combined while still allowing that body of water to meet water quality standards.  *Id.*

54.     Under a TMDL, point sources are assigned "waste load allocations" while nonpoint sources receive "load allocations."

55.    The waste load allocations for point sources are reflected in the permit as discharge limits.

56.    40 C.F.R. 122.44(d)(1)(vii)(B) requires that effluent limits in permits be consistent with "the assumptions and requirements of any available waste load allocation" in an approved TMDL.

57.    The CWA limits the ability of point sources to discharge into impaired waters.

58.    EPA's regulations for state NPDES programs prohibit the issuance of permits "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States."  40 C.F.R. § 122.4(d).

59.    40 C.F.R. § 122.4(d) applies to both federal and state NPDES programs under 40 C.F.R. § 123.25.

60.    EPA's regulations prohibit the issuance of a permit to "a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  40 C.F.R. § 122.4(i).

61.    "[A] permit may not be renewed, reissued, or modified . . . to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit." 33 U.S.C. § 1342(o).  This provision is known as the anti-backsliding provision.

62.    Trading allows point sources to avoid or outright violate their NPDES permit by discharging greater amounts of pollutants than their waste load allocations permit.

63.    Trading allows point sources to avoid technology and/or water quality based standards.  *See* 33 U.S.C. § 1311.

64.    Trading is illegal under the source-by-source, technology-based mandate of the CWA and the anti-backsliding provision.  *See* S. Rep No. 92-414 at 70 (1972).

## CLAIMS FOR RELIEF

65.    Plaintiffs hereby incorporate all previous paragraphs as if fully set forth herein.

## COUNT I

**EPA's Authorization of Pollution Trading is Unlawful, Arbitrary and Capricious**

66.    EPA's approval of pollution trading under the Chesapeake Bay TMDLs is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

67.    Pollution trading between point sources and nonpoint sources is not authorized under the CWA.

68.    Pollution trading between point sources only is not authorized under the CWA.

69.    Any pollution trading between and among sources is not authorized under the CWA.

70.    The CWA does not allow sources of any kind to exceed their TMDL allocations or wasteload allocations in exchange for pollution reductions in another location.

71.    Point source permitting provisions of the CWA, with its source-by-source reduction mandate, do not allow for such sources to avoid any permit limitations—including technology-based, water quality-based or wasteload limitations—through a pollution trading program.

72.    Allowing point sources of pollution to engage in trading undermines EPA's ability to provide reasonable assurances that point sources will be able to meet the waste load allocations contained in the TMDL.

73.     EPA's authorization of trading under the Chesapeake Bay TMDLs exceeds the agency's authority under 33 U.S.C. § 1313 and other provisions of the CWA.

74.     EPA provides no rational basis to support a conclusion that pollution trading will ensure compliance with applicable water quality standards in the Chesapeake Bay or its tributaries.

75.     EPA provides no rational basis to support a conclusion that the states or EPA can adequately verify, track, and monitor trading activity in order to prevent worsening water quality and ensure compliance with water quality standards.

76.     EPA's authorization of pollution trading without first establishing mandatory enforceable safeguards creates a serious risk that pollution trading will impede or impair achievement of water quality standards in the Chesapeake Bay and its tributaries, in violation of its mandate under the CWA.

77.     EPA's authorization of pollution trading is unlawful, arbitrary and capricious.

## COUNT II

### EPA's Authorization of Offsets for New or Expanded Pollution Sources is Unlawful, Arbitrary and Capricious

78.     The TMDL "does not provide a specific allocation to accommodate new or increased loadings" of pollutants.  TMDL at 10-1.

79.     Instead of accommodating growth, EPA "expects" jurisdictions to address new or increased loadings of pollutants through "credible and transparent offset programs subject to EPA oversight."  TMDL at 10-1.

80.     EPA "encourages and expects that the jurisdictions will generally develop and implement programs for offsetting new and increased loadings" in accordance with the EPA's prescribed definitions and "common elements." TMDL at 10-3; TMDL at Appendix S.

81.     Rather than requiring strict adherence to nonpoint source load allocations and point source waste load allocations, under the TMDL, EPA authorizes trading programs as a component of states' plans for point sources to meet waste load allocations. TMDL at 10-3.

82.     EPA's approval of offsets under the Chesapeake Bay TMDLs is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

83.     EPA's regulations under the CWA prohibit the issuance of a permit to "a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards." 40 C.F.R. § 122.4(i).

84.     New or expanded discharges into the Chesapeake Bay watershed will cause or contribute to ongoing violations of water quality standards in the Bay and its tributaries.

85.     The Final Chesapeake Bay TMDLs does not set aside allocations to allow for additional new or expanded discharges.

86.     New or expanded discharges into the Chesapeake Bay watershed will cause or contribute to ongoing violations of water quality standards in the Bay and its tributaries, even where such new or expanded discharge is "offset" by a reduction in pollution discharges from another source.

87.     Existing dischargers are not subject to compliance schedules designed to achieve compliance with water quality standards.

88.     EPA's authorization of offsets violates the agency's CWA implementing regulations set forth at 40 C.F.R. § 122.4(i)(2) (prohibiting the issuance of a permit to a new or expanded source into already-impaired waters unless "[t]here is sufficient remaining pollutant load allocations to allow for the discharge," and "[t]he existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.").

89.     EPA provides no rational basis to support a conclusion that allowing new or expanded sources to discharge into the Chesapeake Bay watershed, in exchange for making or buying offsets from another location, will result in compliance with applicable water quality standards in the Chesapeake Bay or its tributaries.

90.     EPA's authorization of offsets of new or expanded sources is unlawful, arbitrary and capricious.

### Count III

### EPA's Authorization of Pollution Trading and Offsets Violates Notice and Comment Requirements under the Administrative Procedure Act (APA)

91.     EPA's approval of trading and offsets violates notice and comment requirements under the APA, 5 U.S.C. § 553.

92.     Lawfully promulgated TMDLs cannot be altered unless EPA provides a notice of proposed rulemaking and opportunity for the public to participate in the rule making.  5 U.S.C. §§ 553(b) and (c).

93.     Pollution trading authorizes transferring all or part of one source's share of the Chesapeake Bay TMDL allocations or wasteload allocations to another source.

94.     Pollution trading thus amends the waterways' TMDL.

95.    Pollution trades alter the TMDLs of waterways without amending the Chesapeake Bay TMDL though formal notice and comment procedures.

96.    Allowing new or expanded discharges by one source in exchange for reducing another source's lawfully-approved allocation creates new load allocations that were not included in the final Chesapeake Bay TMDLs.

97.    EPA may not authorize such an allowance without amending the Chesapeake Bay TMDL though formal notice and comment procedures.

98.    Through EPA's approval of trading and offsets under the Chesapeake Bay TMDLs, States or third parties have the ability to alter the Chesapeake Bay TMDLs allocations outside of the legally required process.

99.    EPA violated notice and comment procedures required under 5 U.S.C. §§ 553(b) and (c).

100.    Wherefore, Plaintiffs pray for judgment against Defendants as set forth hereafter.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Food and Water Watch and Friends of the Earth now pray for relief as follows:

101.    Declaratory judgment that the trading provisions of the TMDL are in violation of the Clean Water Act and are null and void.

102.    Such other and further relief as the Court deems just and proper.

Dated this 3rd day of October, 2012
Washington, D.C.

Respectfully submitted,


_____/s/_____
Zachary B. Corrigan
1616 P Street, Suite 300
D.C. Bar No. 497557
Washington, D.C. 20036
202-683-2451
Attorney for Plaintiffs


Susan Kraham
Edward Lloyd
Morningside Heights Legal Services
Columbia Law School
Environmental Law Clinic
410 W. 116th Street
New York, NY 10027
212-854-4291
Attorneys for Plaintiffs