# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| FOOD AND WATER WATCH and | : | | |
| FRIENDS OF THE EARTH | : | | |
| | : | | |
|     Plaintiffs, | : | Civil Action No.: | 12-1639 (RC) |
| | : | | |
|     v. | : | Re Document Nos.: | 35, 36 |
| | : | | |
| UNITED STATES ENVIRONMENTAL | : | | |
| PROTECTION AGENCY and | : | | |
| BOB PERCIASEPE, Acting Administrator | : | | |
| | : | | |
|     Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTIONS TO DISMISS

## I. INTRODUCTION

The plaintiffs in this action challenge the Environmental Protection Agency's ("EPA") "authorization" of pollution trading and offsets outlined in its 2010 Chesapeake Bay Total Maximum Daily Loads ("Bay TMDL"). They allege that the "authorization" of pollution trading and offsets is contrary to the Clean Water Act, and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). They also allege that the "authorization" of pollution trading and offsets violates the APA's requirement for Notice and Comment Rulemaking. The defendants and defendant-intervenors[1] moved to dismiss the Complaint for lack of subject matter

---

[1]     The Court granted two motions to intervene in this case on February 1, 2013: collectively to the American Farm Bureau Federation and the National Association of Home Builders, and collectively to the National Association of Clean Water Agencies, Virginia Association of Municipal Wastewater Agencies, Virginia Nutrient Credit Exchange Association, Inc., Maryland Association of Municipal Wastewater Agencies, Inc., North Carolina Water

jurisdiction because, they allege, the plaintiffs do not have standing. In addition, the defendants moved to dismiss the Complaint for failure to state a claim because, they allege, the plaintiffs do not challenge a final agency action in this case. For the reasons that follow, the Court will grant the defendants' motions to dismiss on both grounds.

## II. FACTUAL BACKGROUND

### A. Statutory Background

The Clean Water Act ("CWA") was implemented to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (a). The Act contemplates collaborative efforts between the Federal Government, through the EPA, and State governments "to develop comprehensive solutions to prevent, reduce, and eliminate pollution in concert with programs for managing water resources." *Id.* § 1251(g).

The CWA specifies that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The CWA recognizes two types of pollutant sources: point and nonpoint. Point sources are defined in the CWA as "any discernible, confined, and concrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Nonpoint sources are not defined in the CWA, but in the regulations promulgating it, and are defined as "not traceable to a discrete identifiable origin, but [as] generally result[ing] from land runoff, precipitation, drainage, or seepage." 40 C.F.R. § 35.1605-4.

---

Quality Association, Inc., the West Virginia Municipal Water Quality Association, Inc., and CSO Partnership, Inc. *See* ECF No. 19. Though the latter group filed an answer, it never filed any dispositive motions, only the former group did. ECF Nos. 20, 34, 35. The latter group of intervenors will nevertheless still be bound by this Court's judgment. *See Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985) ("When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party. The intervenor renders itself 'vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party.'" (citation omitted)).

There are two main ways the CWA controls the discharge of these two sources into navigable waters of the United States: through technology-based controls and through water quality standards. *See, e.g.*, *Bravos v. Green*, 306 F. Supp. 2d 48, 50-51 (D.D.C. 2004). The main technology-based regulation implemented by the CWA is the National Pollutant Discharge Elimination System ("NPDES"). That system only regulates point sources, and does so by allowing the EPA Administrator, and/or the States, to issue permits for the discharge of a point source pollutant. 33 U.S.C. § 1342. The regulations implementing the NPDES system specify that "no permit may be issued [w]hen the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA." 40 C.F.R. § 122.4(a). States are authorized to adopt programs for issuing permits to point sources, but the EPA retains the authority to object to an inadequate State permit and to issue a federal permit instead. 33 U.S.C. § 1342(d). The anti-backsliding provision of the permit system provides that "a permit may not be renewed, reissued, or modified on the basis of effluent guidelines . . . to contain effluent limitations[2] which are less stringent than the comparable effluent limitations in the previous permit." 33 U.S.C. § 1342(o).

The other main way the CWA seeks to control the discharge of pollutants, point source and nonpoint source alike, is through the water quality standards ("WQS") process outlined in Section 303 of the CWA, and codified in 33 U.S.C. § 1313. Section 1313 specifies that "each State shall identify those waters within its boundaries for which the effluent limitations . . . are not stringent enough to implement any water quality standard applicable to such waters." 33

---

[2] In order to carry out the objectives of the CWA, "there shall be achieved . . . effluent limitations. . . ." 33 U.S.C. § 1311(b)(1)(A). "Effluent limitation means any restriction imposed by the Director on quantities, discharge rates, and concentrations of 'pollutants' which are 'discharged' from 'point sources' into the 'waters of the United States.'" *See* 40 C.F.R. § 122.2.

U.S.C. § 1313(d)(1)(A). "Each State shall [also] establish for the waters identified in paragraph (1)(A) . . . the total maximum daily load ("TMDL"), for those pollutants which the Administrator identifies . . . as suitable for such calculation." *Id.* § 1313(d)(1)(C). The regulations implementing the CWA specify that States are to "identify those water quality-limited segments ("WQLS")[3] still requiring TMDLs within its boundaries for which technology-based effluent limitations . . . are not stringent enough to implement any water quality standards applicable to such waters." 40 C.F.R. § 130.7(b)(1)(i)-(iii).

Under § 1313(d)(2), the State shall submit to the Administrator the waters identified and the loads established in sections (1)(A), (1)(B), and (1)(C), and the Administrator shall either approve those identifications and loads, or if the Administrator does not approve the identifications and loads, the Administrator "shall identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters," and then the State shall incorporate them into its "continuing planning process," as codified in § 1313(e). *See* 33 U.S.C. § 1313(d)(2). Each State is to "have a continuing planning process" to ensure that it comports with the TMDL that either it, or the EPA sets. *See* 33 U.S.C. § 1313(e).

Though there is no NPDES analogue for nonpoint sources, the EPA can use federal grants to encourage states to address nonpoint source pollution and implement the load allocations established in a TMDL. *See* 33 U.S.C. § 1329(h). *See also* Chesapeake Bay TMDL ES-8 ("nonpoint sources are not covered by a similar federal permit program; as a result,

---

[3]         A water quality limited segment is defined as "[a]ny segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 of the Act." 40 C.F.R. § 130.2(j).

financial incentives, other voluntary programs and state-specific regulatory programs are used to achieve nonpoint source reductions").

Because this action arises specifically from the EPA's establishment of the Chesapeake Bay TMDL, it is useful to describe what, exactly, a TMDL is. A TMDL is the "total maximum daily load" of a given pollutant that can be added into a navigable water of the United States on a given day. It essentially "identifies the maximum amount of a pollutant that can be added to a body of water consistent with attaining applicable water quality standards." EPA's Mot. to Dismiss 4, ECF No. 36. The way this number is calculated is defined in 40 C.F.R. § 130.2(i), and it turns largely on the amount of point and nonpoint sources of pollution in that particular body of water. "The portion of a receiving water's loading capacity that is allocated to one of its existing or future *point* sources of pollution" is known as the wasteload allocation ("WLA"). 40 C.F.R. § 130.2(h) (emphasis added). "The portion of a receiving water's loading capacity that is attributed either to one of its existing or future *nonpoint* sources of pollution" is known as the load allocation ("LA"). *Id.* § 130.2(g) (emphasis added). The TMDL is the sum of the LA and the WLA, plus a "margin of safety." *Id.* § 130.2(i); 33 U.S.C. §§ 1313(d)(1)(C), (d)(1)(D). *See also* Chesapeake Bay TMDL 1-2.

## B. The Chesapeake Bay TMDL

The Chesapeake Bay is the largest estuary in the United States and one of the largest and most biologically productive estuaries in the world. *See* Chesapeake Bay Protection and Restoration, 74 Fed. Reg. 23,099, 23,099 (May 12, 2009). Unfortunately, and despite decades-long efforts by federal and state regulators, the Bay remains widely polluted, which has prevented "the attainment of existing State water quality standards and the 'fishable and swimmable' goals of the Clean Water Act." *See id.* The main pollutants in the Bay are nitrogen,

phosphorus and sediment. *See* Chesapeake Bay TMDL 2-7, ECF No. 36-1.[4] These pollutants

generally come from point sources such as municipal wastewater facilities and industrial

discharge facilities; and from nonpoint sources such as agricultural lands and other runoff. *See*

*id.* at 4-1.

On December 29, 2010, the EPA established the Chesapeake Bay TMDL because the

State TMDLs were not achieving the water quality standards mandated by the CWA. *See*

Chesapeake Bay TMDL ES-1. The TMDL establishes final load allocations (from both point

and nonpoint sources of pollution) for the entire Chesapeake Bay and it "identifies the necessary

pollution reductions of nitrogen, phosphorus, and sediment across Delaware, Maryland, New

York, Pennsylvania, Virginia, West Virginia, and the District of Columbia and sets pollution

limits necessary to meet applicable water quality standards in the Bay and its tidal rivers and

embayments." Chesapeake Bay TMDL ES-1.

Because the finality and legality of the TMDL are in dispute in this case, it is helpful to

outline several of its key provisions. The Executive Summary of the TMDL explains EPA's

process in establishing the numbers set out in the TMDL. *See* Chesapeake Bay TMDL ES-1–5.

EPA collaborated with the Chesapeake Bay jurisdictions (Delaware, Maryland, Virginia,

Pennsylvania, New York, West Virginia, and the District of Columbia) to arrive at the various

loading allocations. Each State submitted its own Watershed Implementation Plan ("WIP") that

details how each State will implement the TMDL in its own State to achieve its jurisdiction-

specific pollutant loading allocations. The EPA and the Bay jurisdictions went back-and-forth

exchanging drafts of loading allocations, and the draft TMDL was published for a 45-day public

comment period. The EPA then evaluated each State's WIP, along with all the public comments

[4] *also available at* http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay /tmdlexec.html.

to arrive at the TMDL it finally published on December 29, 2010. *Id.* at ES-5. The WIPs "are the roadmap for how the jurisdictions, in partnership with federal and local governments, will achieve and maintain the Chesapeake Bay TMDL nitrogen, phosphorus, and sediment allocations." *Id.* at 7-6.

Section 10 of the TMDL, whose provisions are most in dispute in this case, outlines EPA's expectations for how States will keep pollution levels down despite future population growth. Section 10 begins by discussing offsets, which "[f]or purposes of the Chesapeake Bay TMDL, means . . . compensating for the loading of a pollutant of concern from a point or nonpoint source with a reduction in the loading from a different source or sources, in a manner consistent with meeting WQS." Chesapeake Bay TMDL, Appendix S-2. Section 10.1.2 notes that the "EPA *expects* that new or increased loadings of nitrogen, phosphorus, and sediment in the Chesapeake Bay that are not specifically accounted for in the TMDL's WLA or LA will be offset by loading reductions and credits generated by other sources . . . ." *Id.* at 10-1 (emphasis added). The EPA also states that it "*encourages* and *expects* that the jurisdictions will generally develop and implement programs for offsetting new and increased loadings consistent with the definitions and common elements described in Appendix S . . . ." *Id.* (emphasis added).

Section 10.2 covers water quality trading. The EPA has defined trading as an approach that "allows one source to meet its regulatory obligations by using pollutant reductions created by another source that has lower pollution control costs. Trading capitalizes on economies of scale and the control cost differentials among and between sources." *See* United States Environmental Protection Agency, Final Water Quality Trading Policy 1, January 13, 2003 ("Final Water Quality Trading Policy").[5] With respect to water quality trading, "EPA *recognizes*

_____

[5]        *available at* http://water.epa.gov/type/watersheds/trading/upload

that a number of Bay jurisdictions already are implementing water quality trading programs. EPA *supports* implementation of the Bay TMDL through such programs, *as long as they are established and implemented in a manner consistent with the CWA*, its implementing regulations and the EPA's Water Quality Trading Policy and 2007 Water Quality Trading Toolkit for NPDES Permit Writers." *Id.* at 10-3 (emphasis added). The EPA also states that "an assumption of this TMDL is that *trades may occur* between sources contributing pollutant loadings to the same or different Bay segments, provided such trades do not cause or contribute to an exceedance of WQS in either receiving segment or anywhere else in the Bay watershed." *Id.* (emphasis added). In addition, EPA notes that it "does not support any trading activity that would delay or weaken implementation of the Bay TMDL that is inconsistent with the assumptions and requirements of the TMDL." *Id.*

Appendix S of the TMDL outlines the common elements from which the EPA "expects" the jurisdictions to develop and implement offset programs. *See id.* at S-1–S-2. Appendix S goes on to note that, "*[t]hose common elements are not presented here as regulatory requirements*. However, EPA believes that in the aggregate, they will help to ensure that offsets are achieved through reliable pollution controls and that the goals of the Bay TMDL are met . . . ." *Id.* (emphasis added).

The EPA's authority to oversee such a comprehensive management plan stems in part from 33 U.S.C. § 1313(e) and in part from 33 U.S.C. § 1267(g), which states that the "Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the

---

/2008_09_12_watershed_trading_finalpolicy2003.pdf.

Chesapeake Bay Agreement to achieve and maintain" the goals of the Chesapeake Bay Agreement.[6]

### C. Plaintiffs' Allegations

Plaintiff Food and Water Watch is a non-profit organization that advocates for common sense policies that will result in access to safe and healthy food and clean water. Am. Compl. ¶ 6, ECF No. 29. Its "members live, work, recreate, and own property in the lands and waters of the Chesapeake Bay watershed." Am. Compl. ¶ 7. Plaintiff Friends of the Earth, Inc., is a non-profit environmental advocacy organization whose "mission is to defend the environment and champion a healthy and just world." Am. Compl. ¶ 8. Its members also live near and enjoy the area surrounding the Chesapeake Bay watershed. Am. Compl. ¶ 9. Plaintiffs allege that the Chesapeake Bay TMDL reflects the EPA's "authorization" of offsets and water pollution trading and that such "authorization of pollution trading is unlawful, arbitrary and capricious." Am. Compl. ¶¶ 88-96. In addition, they allege that "EPA's authorization of offsets for new and expanded pollutions sources is unlawful, arbitrary and capricious" and that "EPA's authorization of pollution trading and offsets violates notice and comment requirements under the APA." Am. Compl. ¶¶ 101-123.

Because of this "authorization," plaintiffs allege that their members' ability to enjoy the Chesapeake Bay will be impaired. For instance, Food and Water Watch member Paul Stern "lives near a new point source that will be allowed to discharge if and when it identifies offsets

---

[6]     The term "Chesapeake Bay Agreement" means "the formal, voluntary agreements executed to achieve the goal of restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem and signed by the Chesapeake Executive Council." *See* 33 U.S.C. § 1267(a)(2). The EPA explained in the TMDL that "[i]n establishing the Bay TMDL, EPA acted pursuant to the consensus direction of the Chesapeake Executive council's PSC [principal's staff committee] and in partnership with each of the seven Chesapeake Bay watershed jurisdictions." *See* Chesapeake Bay TMDL at 1-16.

as required by the TMDL." Pl.'s Opp. Mot. to Dismiss 15, Stern Decl. ¶ 6, ECF No. 39-1.

Another member, Fred Tutman, alleges that "EPA's authorization of pollution trading has and will diminish his enjoyment of the beauty and natural resources of the Chesapeake Bay." Pl.'s Opp. Mot. to Dismiss 15, Tutman Decl. ¶ 5, ECF No. 39-5. Additionally, plaintiffs' members generally "are all concerned about the creation of hot[ ]spots in the Bay watershed where high levels of pollution will exacerbate existing impairments." Pl.'s Opp. Mot. to Dismiss 16, ECF No. 39. They allege that "hotspots" are "created when one source increases its discharges into a water body because it has purchased pollution credits from another source that has allegedly decreased its discharges." Pl.'s Opp. Mot. to Dismiss 14. The defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Court now turns to the relevant legal standards.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Motion to Dismiss for Lack of Subject Matter Jurisdiction (12(b)(1))

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. E.P.A.*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). It is the plaintiff's burden to establish that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v.*

*Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987). Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

The D.C. Circuit has explained that a motion to dismiss for lack of standing constitutes a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because "the defect of standing is a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). *See also City of Harper Woods Employees' Retirement Sys. v. Olver*, 577 F. Supp. 2d 124, 128 (D.D.C. 2008) ("In this jurisdiction, a motion to dismiss for lack of standing is treated as a challenge to the subject matter jurisdiction of the court, and is properly analyzed under Rule 12(b)(1).").

### 2. Motion to Dismiss for Failure to State a Claim (12(b)(6))

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not

necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## B. Standing

The defendants first argue that the plaintiffs do not have standing to bring this case, and for that reason, the court lacks subject matter jurisdiction to hear it. In order to demonstrate Article III standing, a plaintiff must meet three requirements. First, "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560-561 (citations omitted). Finally, "it must be likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." *Id.* at 561. To establish standing to sue on behalf of its members, an organization must demonstrate that "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. F.C.C.*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

### 1. Injury

With respect to the injury, "[a] prospective plaintiff must show that it has suffered a concrete and particularized injury in order to convince the court that it is sufficiently involved in the current legal dispute to have a defined and personal stake in the outcome of the litigation." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996). The Supreme Court has "repeatedly reiterated that the threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Clapper v. Amnesty Intern., USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis in original, internal quotation marks omitted). The plaintiffs allege that their members are "fearful of using waters contaminated by NPDES permit holders who discharge excess pollutants pursuant to trading and offset programs." Am. Compl. ¶¶ 7, 9. To show that their injuries are particularized, the plaintiffs cite declarations by various members whose use and enjoyment of the Chesapeake Bay will be impaired because of EPA's "authorization" of the offset and trading program. For instance, one member alleges that EPA's "authorization" of pollution trading has and will diminish his enjoyment of the beauty and natural resources of the Chesapeake Bay, because the issuance of certain NPDES permits by state agencies will lead to the creation of "hotspots" and other over-polluted areas in the Bay. *See* Walls Decl. ¶ 25, ECF No. 39-3. Another individual member "is

concerned that increased pollution and sediments from new or increased discharges will impede his ability to enjoy" walking, hiking, and kayaking near the Chesapeake Bay. *See* Stern Decl. ¶¶ 11-12; *see also* Tutman Decl. ¶ 22. Such aesthetic, recreational injuries are cognizable injuries-in-fact. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envt'l. Svcs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." (citations omitted)); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972).

The plaintiffs' standing problem, however, is not the lack of a particularized injury[7]—it is the lack of an actual or imminent one. To show that their injury is actual or imminent, the plaintiffs allege, through declarations by their members, that their use and enjoyment of the Chesapeake Bay will be affected by the creation of "hotspots" once various state agencies start granting new or modified NPDES permits to would-be polluters. Pl.'s Opp. Mot. to Dismiss 14-16. The plaintiffs also allege that the West Virginia Department of Environmental Protection's ("WVDEP") granting of a "NPDES permit to Mountain Springs Utility is one such offset that injures Plaintiffs' members." *Id.* at 18. They also allege that WVDEP has "permitted a permit modification on an offset for the Jefferson County Public Service District," and that Maryland "began a process to certify farms for credit generation." *Id.* at 19.

The creation of "hotspots" by the issuance of such permits is neither actual nor imminent. There is no indication that the trading and offset programs supported by—but not required or

---

[7] To the extent the plaintiffs allege that their injury is a procedural one in that the EPA violated the APA's notice-and-comment requirement (*see* Pl.'s Opp. Mot. to Dismiss 26, EPA's Mot. to Dismiss 18), it is clear that "the deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009).

"authorized" by—the EPA will result in the creation of "hotspots" of pollution. The plaintiffs

offer no support beyond their own conclusory allegations that "hotspots" have been, or

necessarily will be created by the offset and trading programs. They describe "hotspots" as areas

"where increased discharges of pollutants will occur resulting in water quality that is worse than

other areas in the watershed."[8] *Id*. at 14. However, all the provisions of the TMDL and the Bay

jurisdictions' WIPs specifically state that any implementation program must comply with the

requirements of the CWA and the TMDL itself. To the extent trades and permits were and are

granted by the various state agencies, such offsets would still have to comport with the TMDL

and the CWA, and no offset or trade could be permitted if it would result in an "exceedance of

WQS [water quality standard] in either receiving segment or anywhere else in the Bay

watershed." Chesapeake Bay TMDL at 10-3. Nor could any trading or offsetting occur if it

would "delay or weaken implementation of the Bay TMDL, [or be] inconsistent with the

assumptions and requirements of the TMDL." *Id.* Nor could a permit issue "[w]hen the

imposition of conditions cannot ensure compliance with the applicable water quality

requirements of all affected States." 40 C.F.R. § 122.4(d). As the defendants aptly note, the

plaintiffs "fail to explain how any trading or offsets authorized by a State could override the

[CWA's] overarching command that a point source discharge that does not comply with a permit

is a violation of the Act." EPA's Mot. to Dismiss 17, ECF No. 36. The creation of "hotspots"

(to the extent such creation even results in an actionable injury) in other words, is highly

speculative and therefore not "certainly impending" enough to show an actual or imminent injury

for purposes of Article III. *See Clapper*, 133 S. Ct. at 1147.

---

[8] Plaintiffs do not explain whether this term is a term of art that derives from the CWA, its implementing regulations, or the case law interpreting them. In fact, it is not clear that the creation of a "hotspot" necessarily violates the CWA.

Additionally, the plaintiffs' complaints about the State agencies' actions do not establish an actual or imminent injury. As the EPA points out in its reply brief, the WVDEP has rescinded the certificate of convenience and necessity for the Flowing Spring Wastewater Treatment Plant that the plaintiffs indicated would lead to an offset of 500 lbs/year of nitrogen downstream. *See* EPA's Reply 15-16, ECF No. 42; West Virginia Department of Environmental Protection Letter from Scott Mandirola at 2, ECF No. 39-3 (explaining the modification of a permit for the Flowing Springs Wastewater Treatment Plant); EPA's Reply Brief Ex. A, Public Service Commission of West Virginia Commission Order at 22, ECF No. 42-1 (ordering that "the District petition for approval of revised financing and post-project rates for its Flowing Springs Project is denied and the previously issued certificate of convenience and necessity for the Flowing Springs project *is rescinded*." (emphasis added)). Therefore, the permit modification— issued in 2006, well before the creation of the TMDL—is moot because the plant whose loads it authorized will not be financed, and therefore will not be constructed.

The Mountain Springs Utility also poses no injury to the plaintiffs—actually or imminently. The plaintiffs essentially note this themselves saying that the Utility will be allowed to discharge extra pollutants "*once* it identifies an offset." Pl.'s Opp. Mot. to Dismiss 19 (emphasis added). *See also id.* at 15 ("Paul Stern . . . lives near a new point source that will be allowed to discharge *if and when* it identifies offsets as required by the TMDL." (emphasis added)). *See also* Stern Decl. ¶ 9 ("the agency does not allow any operation or discharge of any phosphorus or nitrogen from the wastewater treatment plant under any circumstances *until appropriate offsets have been obtained*" (emphasis added)). The permit the plaintiffs fear will cause increased levels of pollution, therefore, is not even in effect, and it will not be until the Utility identifies an offset that comports with the requirements of the Bay TMDL, and more

importantly the CWA. Thus, it is not "certainly impending" that any injurious discharges will occur if lawful offsets cannot be identified by the plant, and thus the plaintiffs may never suffer an injury. Moreover, and as set forth above, even if permitted discharges begin, there is no indication that such discharges will cause the plaintiffs any actionable injury. Each permit issuance and modification must comport with the requirements of the Bay TMDL and the CWA. *See, e.g.*, Pl.'s Opp. Mot. to Dismiss, WVDEP letter, ECF No. 39-1 ("the nitrogen and phosphorus loadings associated with this new discharge must be offset so that there is no net increase in loading to the Chesapeake Bay"); 33 U.S.C. § 1342(o) ("a permit may not be renewed, reissued, or modified on the basis of effluent guidelines . . . to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit"). There is no indication that, even if offsets are identified and permitted discharges begin, that such discharges will not comport with that relevant water segment's TMDL, contain higher pollutants than allowed under the previous permit, or not comport with the CWA. The purported injury that the plaintiffs envision is thus far too speculative, as the entire purpose of the Bay TMDL is to reduce the amount of pollution in the Chesapeake Bay—not to increase it.

### 2. Traceability

Even if the plaintiffs could show that their injury was actual or imminent, they would still have a serious traceability problem. The Supreme Court has stated that "[w]hen the suit is one challenging the legality of government action or inaction . . . [and] a plaintiff's asserted injury arises from the government's allegedly unlawful regulation of someone else . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 561-62. *See also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 29, 41-42 (1976) ("Art. III

still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").  The D.C. Circuit has explained that "[w]hen a plaintiff's asserted injury arises from the Government's regulation of a third party not before the court, it becomes 'substantially more difficult to establish standing.'"  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (citing *Lujan*, 504 U.S. at 562).

The plaintiffs make two arguments on causation.  First, they argue that the EPA's references to offsets and trades in the Bay TMDL has *indirectly* caused their injury "through authorization," citing *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440-44 (D.C. Cir. 1998) (en banc) and *Am. Road & Transp. Builders Ass'n v. E.P.A.*, 588 F.3d 1109 (D.C. Cir. 2009), for the proposition that even if the EPA itself did not directly cause the plaintiffs' injuries, it could still satisfy the traceability requirement through authorization of third party conduct that directly caused the plaintiffs' injuries.[9]  *See* Pl.'s Opp. Mot. to Dismiss 20-21.  Second, the plaintiffs argue that the EPA's references to offsets and trades in the Bay TMDL has *directly* caused their injury by coercing and "strong-arming" States into implementing offset and trading programs, thereby serving as a proxy for a command.[10]  *See* Pl.'s Opp. Mot. to Dismiss 22-23. As to this point, the plaintiffs argue that "EPA *essentially* requires" States to adopt offsets and trading programs to comply with the Bay TMDL, and that the EPA's review of the States'

---

[9]      As another court explained: "[c]ausation and redressability thus are satisfied [where] . . . the intervening choices of third parties are not truly independent of government policy." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004).  Importantly, in the D.C. Circuit, "a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct *that would otherwise be illegal in the absence of the Government's action*." *Id.* at 940 (emphasis added).  In this case, the third party conduct "authorized"— offset and trading programs—would not "otherwise be illegal in the absence of the Government's action."

[10]      Given the plaintiffs' litigation position that offset and trading programs violate the CWA, it appears that their "concern" about such coercion is strategic rather than empathetic.

implementation plans "constitutes de facto approval authority" of the offset and trading

programs. *Id.* at 9, 22 (emphasis added).

The plaintiffs are incorrect on both counts for similar reasons. First, the Bay TMDL does

not authorize offset or trading programs. The plaintiffs' repetition of that assertion throughout

their opposition does not make it more true. The trading program being challenged here has

been approved by the EPA since 2003 (at the latest), when the EPA established its Water Quality

Trading Policy Statement. *See generally* Final Water Quality Trading Policy. Since (or even

before) then, many States have engaged in trading and offset programs to achieve desired water

quality levels, including States in the Chesapeake Bay. *See, e.g.*, VA. CODE ANN. § 62.1-

44.19:12 (West 2013) (explaining that because of the *2000* Chesapeake Bay Agreement, the

"General Assembly finds and determines that adoption and utilization of a watershed general

permit and market-based point source nutrient credit trading program will assist" in achieving

water quality) (emphasis added); 25 PA. CODE § 96.8 ([Oct. 9,] 2010) (outlining the use of

offsets and tradable credits from pollution reduction in the Chesapeake Bay watershed);

Chesapeake Bay TMDL 10-3 ("EPA recognizes that a number of Bay jurisdictions are already

implementing water quality trading programs."). In addition, offset programs have been

authorized and supported by the EPA since at least the 1980s. *See, e.g.*, Environmental

Protection Agency, Office of Water, A Summary of U.S. Effluent Trading and Offset Projects,

November 1999 (listing various offset programs, including several in the Chesapeake Bay

States) [hereinafter "A Summary of U.S. Effluent Trading and Offset Projects"].[11] To the extent

there is any cognizable injury caused by the offset and trading programs, then, it cannot be traced

---

[11]     available at http://water.epa.gov/type/watersheds/upload/2000_01_21_
watershed_trading_traenvrn.pdf.

to the 2010 Chesapeake Bay TMDL because the TMDL does not authorize or require such programs, as they already existed before the establishment of the 2010 TMDL.

Second, the plaintiffs mischaracterize the EPA's role in the supervision of the States' WIPs. The EPA does have an extensive role in helping States develop their respective implementation plans, as demonstrated in particular in this case. *See* Chesapeake Bay TMDL ES-5. But ultimately, it is up to the States to choose how to implement those plans. *See* 33 U.S.C. §1313(e). That being said, States are often left with the difficult choice of implementing the TMDL in accordance with EPA's suggestions, or face losing federal grants if they do not. *See Pronsolino v. Marcus*, 91 F. Supp. 2d 1337, 1340 (N.D. Cal. 2000) (explaining that "failure to implement the TMDL [established by the EPA] could imperil federal funding"); *id.* at 1355 ("[The State] is also free to moderate or to modify the TMDL reductions, or even refuse to implement them, in light of countervailing state interests. Although such steps might provoke EPA to withhold federal environmental grant money, [the State] is free to run the risk. A practical reality, of course, is that once federal environmental grant money begins to flow, state regulatory agencies become dependent on it [and] [t]hey become sensitive to threats to terminate it . . . ."). The EPA's extensive involvement in the planning process is not, however, tantamount to "authorization" of State action, but instead, a result of the structure of the CWA, which contemplates both State and federal involvement in the process. *See* 33 U.S.C. § 1251(g). Moreover, the difficult choices States face is just a reflection of the reality that if States wish to accommodate growth and development and meet the goals of the CWA, they may have to use offsets and trading programs to implement the Bay TMDL, which happen to be encouraged and supported—but not authorized—by the Bay TMDL.

The plaintiffs' coercion arguments similarly ignore the practical reality of the difficult choices States face—which, again, is not the result of EPA strong-arming or coercion in the Bay TMDL document—but of the balance States must strike if they want to—in an environmentally-friendly and cost-effective way— (1) comply with the TMDL numbers allotted to them, (2) comport with the CWA, and (3) accommodate population growth, and promote agricultural and industrial growth.  Offsets and trades are but one option in the States' arsenal for achieving those goals—that the EPA encourages the use of trades and offsets does not make it the States' only option, or a coercive one at that, in achieving water quality.

Neither does the fact that the EPA retains supervisory authority over the TMDL implementation process amount to causation through coercion.  As the EPA's supplemental authority notes, though "there may be a fine line between collaboration and coercion, the court finds this [TMDL] framework to be more indicative of collaboration.  The purpose of the revision process  . . . was to strengthen the WIPs to ensure attainment of water quality standards through the use of both federal and state resources and expertise . . . [and] the record is replete with numerous communications that demonstrate discussion, debate, and negotiation between the federal and state government, not coercion."  *See American Farm Bureau Fed'n v. E.P.A.*, No. 1:11-cv-0067, 2013 WL 5177530, at *29 (M.D. Pa. Sept. 13, 2013).  Thus, there is no coercion, commanding, or "strong-arming" here, but instead, a joint federal and state effort aimed at achieving a common objective: better water quality.

The plaintiffs' purported injury, then, is not ultimately caused by the Bay TMDL—directly or indirectly—because the Bay TMDL does not "authorize" any third party action, nor does it coerce States into implementing any programs they would not consider implementing on their own.

### 3. Redressability

Even if the plaintiffs could establish an injury that is traceable to the conduct of the EPA, it would still not be redressed by a decision in their favor. With respect to the redressability analysis, a court "examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663-64. The plaintiffs seek a declaratory judgment from this Court "that the trading and offset provisions of the TMDL are in violation of the Clean Water Act and notice and comment procedural requirements of the APA and are null and void." Am. Compl. ¶ 124.

The relief the plaintiffs seek cannot be redressed by an order from this Court. As set forth above, the EPA did not "authorize" offsets and trading programs, as the plaintiffs repeatedly assert. Rather, the EPA made statements in the TMDL referencing already-existing (and state-implemented) trading and offset programs. This Court could only order those references removed from the Bay TMDL—but such an order would not change the legal landscape because (1) the authority to implement offset and trading programs is with the States themselves, (2) there is no WIP approval before the Court, and (3) the pre-existing 2003 EPA Water Quality Trading Policy remains in place. Therefore, any order from this Court removing all references in the Bay TMDL to offsets or trades would have no effect on the legal landscape, and would therefore not redress the plaintiffs' injuries.[12]

---

[12] This is not to say that the approval of offsets and trades that violate the CWA could not be challenged. They certainly could be challenged—through the remedial scheme created by the CWA itself. If the EPA issues an NPDES permit that violates the CWA, that action is subject to judicial review in the Court of Appeals. *See* 33 U.S.C. § 1369(b)(1)(F). If it is issued by a State agency, the State is obligated under the CWA to provide a judicial review process. *See* 40 C.F.R. § 123.30. In addition, the citizen-suit provision of the CWA allows "any citizen" to "commence a civil action on his own behalf against any person [including the United States and other government agency] . . . who is alleged to be in violation of" the CWA. *See* 33

The plaintiffs have failed to show that they have an actual or imminent injury that is traceable to the EPA's conduct and redressable by an order of this Court. Therefore, the Court must dismiss this case for lack of subject matter jurisdiction. [13]

## C. Ripeness

The defendants also argue that the plaintiffs' claims are not ripe for adjudication. The D.C. Circuit has explained that "[r]ipeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treas. Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). *See also Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) ("Just as the constitutional standing requirement for Article III

---

U.S.C. § 1365(a)(1). Thus, there are other ways the plaintiffs can seek redress from the appropriate entities if, and when, a violation of the CWA, and in turn, an injury, occurs.

[13] The only other case considering the Chesapeake Bay TMDL's legality is *American Farm Bureau Fed'n v. E.P.A.*, No. 1:11-cv-0067, 2013 WL 5177530, at *1 (M.D. Pa. Sept. 13, 2013). In that case, the court found that the plaintiffs had standing to challenge the TMDL because the injury they alleged—economic injury from having to comply with the requirements of the TMDL—was traceable to the EPA's establishment of the TMDL. *Id.* at *18-19. The challenge in that case was to the legality of the TMDL itself—not its references to the permissive offset and trading program being challenged in the instant action. Additionally, the injury alleged there was an actual and imminent economic injury of having to comply with the TMDL requirements, which arose directly from the EPA's establishment of the TMDL itself. That court's reasoning is not inconsistent with this Court's logic because the plaintiffs here (1) do not allege an actual or imminent injury as set forth above, and (2) do not challenge the TMDL itself, but instead challenge EPA's "authorization of offsets and trading." Because as set forth above, such purported "authorization" does not arise from the Bay TMDL, that district court's finding on standing does not conflict with this Court's finding.

Also, the Court notes that the defendant-intervenors in this case were the plaintiffs in *American Farm Bureau*. They challenged the Bay TMDL as contrary to the Clean Water Act and as arbitrary and capricious in violation of the APA. The district court upheld the Bay TMDL in that case, whose decision is currently on appeal in the Third Circuit Court of Appeals. *See* Notice of Appeal, *American Farm Bureau Fed'n, et al. v. E.P.A.*, No. 11-0067 (M.D. Pa. October 7, 2013), ECF No. 153; Civil Case Docketed, *American Farm Bureau Fed'n, et al. v. E.P.A.*, No. 13-4079 (3d Cir. October 16, 2013). The plaintiffs in that case intervened in this case because, "to the extent the Bay TMDL survive[d] their lawsuit, Intervenors' members will depend on, and benefit from, state pollutant trading and offset programs during the states' implementation of the Bay TMDL." Def. Intervenor's Mot. to Dismiss 2 n.1, ECF No. 35-1.

23

jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury."). If a court establishes constitutional ripeness, it then goes on to analyze the prudential aspect of ripeness, which is "where a court balances 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Nat'l Treas.*, 101 F.3d at 1427-28 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The Supreme Court has elaborated that with respect to the ripeness inquiry, the court must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative actions, and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). The "paradigmatic hardship situation is where a petitioner is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for non-compliance." *Natural Res. Def. Council, Inc. v. E.P.A.*, 859 F.2d 156, 166 (D.C. Cir. 1988). In addition, "neither the possibility that the petitioner may have to make capital budgeting decisions under a cloud of uncertainty, nor the fact that it may incur future expense in challenging the regulations in a later permit or enforcement proceeding, will qualify as hardship." *Id.* (citations omitted).

The ripeness requirement has been described as being designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Wyo. Outdoor*, 165 F.3d at 50 (quoting *Abbott Labs*, 387 U.S. at 148-49). In *Wyoming Outdoor*, for instance, the plaintiffs challenged U.S. Forest Service regulations that had designated certain lands as suitable for oil and gas leases. *Id.* at 45, 50. The

court found the plaintiffs' challenges (brought under the National Environmental Policy Act) unripe for review because of the multiple-stage nature of the agency action at issue—it was when the agency actually issued a lease under the regulations, after other phases of regulation it promulgated, that the agency action would be ripe for review, and that had not yet happened in that case. *See id*. at 50. *See also Cntr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (finding plaintiff's National Environmental Policy Act claims not ripe because the Department of Interior had only approved a leasing program and no leases had yet been issued under it).

In this case, the Court finds that none of the elements of the ripeness inquiry are satisfied. First, as set forth above, there is no injury that is certainly impending in this case to meet the constitutional ripeness requirement. Second, even if there were, the Court does not find that the plaintiffs can establish any prudential aspect of ripeness. To begin, there is no indication that the plaintiffs will suffer any hardship from the lack of judicial review at this stage in the litigation. The trading and offsets statements in the Bay TMDL impose no legal obligation on the plaintiffs—or any other actor for that matter—and therefore, there is no risk that plaintiffs will have to expend resources in order to comply with the EPA's "requirements." In addition, judicial intervention at this stage would be premature because any reviewing court could benefit from further factual development. For instance, there is currently no indication that the EPA (or any state actor) is issuing any permits in violation of the provisions of the CWA. Nor is there any indication that any permits have been issued by the EPA or state agencies that has actually, or imminently will, injure the plaintiffs. Because there are multiple stages to the implementation of the Bay TMDL at issue here, and the implementation occurs primarily through the actions of

state actors, who are not parties to this action, judicial intervention at this time would be inappropriate, as further factual development would better help a court adjudicate these issues.[14]

### D.   Failure to State a Claim

Even if the Court were to find that the plaintiffs had standing, this case must nevertheless be dismissed for failure to state a claim under the APA.  Review under the APA requires final agency action.  *See* 5 U.S.C. § 704 ("agency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added)).  The plaintiffs have failed to challenge a final agency action.

Under the test articulated in *Bennett v. Spear*, "two conditions must be satisfied for agency action to be 'final:'  First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).  And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Id.*  The D.C. Circuit has given guidance as to the second prong of the *Bennett* test.  "In determining whether an agency has issued a binding norm . . . we are guided by two lines of inquiry.  One line of analysis considers the effects of an agency's action, inquiring whether the agency has (1) imposed any rights and obligations or (2) genuinely left the agency and its

---

[14]    The plaintiffs rely on *Time Warner Entm't Co. v. F.C.C.*, 93 F.3d 957, 974 (D.C. Cir. 1996), which held a challenge to FCC regulations ripe even though local franchise authorities had discretion whether to implement certain programming.  The plaintiffs analogize that case to the instant action, where state authorities have discretion whether to implement the trading and offset programs "authorized" by the EPA.  That case, however, is distinguishable because in that case, the plaintiffs were challenging a statutory provision that they alleged violated the First Amendment.  Thus, the question presented was purely a legal question of statutory interpretation—having to do with the legal impact of an act of Congress.  Here, the plaintiffs are not challenging *a statute*, but rather what they deem to be *agency action*, where the purely legal question cannot be reached if there is no *final* agency action.  Because as explained in Part D of this opinion, there is no final agency action, the legal question cannot be reached and *Time Warner* is inapposite.

decisionmakers free to exercise discretion." *Cntr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (citations omitted). "The second line of analysis looks to the agency's expressed intentions. This entails a consideration of three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations;[15] and (3) whether the action has binding effects on private parties or on the agency." *Id.* at 806-807.

In *Cntr. for Auto Safety*, the plaintiffs challenged letters sent to various vehicle manufacturers which outlined NHTSA's "policy guidelines" for "regional recalls." *Id.* at 799-800. The court held that the NHTSA Guidelines did not constitute final agency action because, under the second prong of the *Bennett* test, NHTSA "has not commanded, required, ordered, or dictated," and the "agency remains free to exercise discretion in assessing proposed recalls and in enforcing the Act." *Id.* at 809. The court also went on to say that "it does not matter that agency officials have *encouraged* automakers to comply with the guidelines." *Id.* (emphasis in original). The guidelines still amounted to nothing more than a general statement of policy. *Id.* Moreover, the NHTSA Associate Administrator had no authority to issue binding regulations under the relevant statutory provision in that case. *Id.* at 810. Thus, the letters were really nothing more than guidelines. *Id.* Similarly, in *Nat'l Ass'n of Home Builders v. Norton*, the

---

[15] The plaintiffs make much of the fact that the TMDL was published in the Federal Register as an indication that the "authorization for offsets and pollutant trading" represents final agency action. The Court notes that what was published in the Federal Register was EPA's "Notice for the Establishment of the Total Maximum Daily Load (TMDL) for the Chesapeake Bay"—not the TMDL itself. *See* 76 Fed. Reg. 549 (January 5, 2011). That notice gives a brief overview of the TMDL. The TMDL itself, however, is not published in the Federal Register or the Code of Federal Regulations. Importantly, the notice published in the Federal Register explains that "[o]ther provisions of the CWA, as well as the jurisdictions' Watershed Implementation Plans (WIPs), were developed to implement the Bay TMDL." 76 Fed. Reg. at 550. Thus, the only part of the TMDL published in the Federal Register recognizes that the TMDL itself is not self-executing, requires further implementation efforts by the States to come into effect, and therefore certain of its provisions are not final.

court found that a Fish & Wildlife Service Protocol that outlined recommendations for detecting the endangered Quino Butterfly was not a final rule because it did not establish a binding norm, but rather served as a recommendation. 415 F.3d 8, 11-12, 14 (D.C. Cir. 2005). The court explained: "[g]iven the voluntary nature of the language contained in the Protocols, it is futile for Home Builders to argue that the Protocols are binding on their face." *Id.* at 14.

Under either line of analysis, the Court finds that there is no final agency action here. The same problems that plague the plaintiffs' standing arguments also undermine their argument that the Bay TMDL document's reference to offsets and trading constitutes final agency action: such references do not impose any binding or legal obligations on any actor. The EPA's language in the Bay TMDL regarding offsets and trading does not legally require any conduct, but rather serves as an "informational tool."[16] *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002). The Bay TMDL uses verbs such as: "EPA *expects*[17] that new or increased loadings

---

[16]     The agency action the plaintiffs contest is the purported "authorization of offsets and trades" in the Chesapeake Bay TMDL. *See* Am. Compl. ¶¶ 88-123, ECF No. 29. The plaintiffs do not challenge the legality of the TMDL itself—only the provisions purportedly authorizing what they deem to be illegal water pollutant trading. The parties—and the Court— are in agreement that the Chesapeake Bay TMDL is a final agency action in itself. That is not in dispute. *See Sierra Club v. E.P.A.*, 162 F. Supp. 2d 406, 420 (D. Md. 2001) ("approval or disapproval of state submissions under the Clean Water Act is not rule making; it is only the actual development of the list or load that is rule making"). *See also* EPA's Reply 9, ECF No. 42 ("nor is there any dispute that EPA's establishment of the Bay TMDL is a final agency action . . . ."). As defendants point out, though, "[t]he fact that EPA took final action to establish the Bay TMDL does not, however, mean that every associated statement is equally 'final' within the meaning of the APA." *See id.* (citing *Natural Res. Def. Council v. E.P.A.*, 559 F.3d 561, 564-65 (D.C. Cir. 2009) (finding the preamble statements were not final agency action because the EPA spoke in the conditional and the preamble statements had no legal consequences); *Interstate Natural Gas Ass'n of Am. v. F.E.R.C.*, 285 F.3d 18, 59-61 (D.C. Cir. 2002) (finding that the discussion of seasonal rates within a final rule "represents only a policy statement and therefore is neither binding on any party nor ripe for judicial review")).

[17]     The word "expect" is the most forceful verb used in the TMDL, and even still, its use does not impose any requirement on the States. In the context of the EPA's relationship with the Bay States, it is clear that use of that word simply acknowledges the fact that States face difficult decisions when it comes to implementing TMDLs. Based on the conversations between

. . . will be offset by loading reductions . . . ."  Chesapeake Bay TMDL 10-1 (emphasis added);

EPA "*encourages* and *expects* that the jurisdictions will generally develop and implement

programs for offsetting new and increased loadings . . . ."  *Id.* at 10-2 (emphasis added);  EPA

"*recognizes* that a number of Bay jurisdictions *already are implementing* water quality trading

programs.  EPA *supports* implementation of the Bay TMDL through such programs, as long as

they are established and implemented in a manner consistent with the CWA . . . ."  *Id.* at 10-3

(emphasis added);  "An *assumption* of this TMDL is that trades *may* occur between sources

contributing pollutant loadings to the same or different Bay segments."  *Id*. (emphasis added).  In

addition, in Appendix S, the EPA notes that the common elements (which include trading and

offsets) it hopes each State will implement "*are not presented here as regulatory requirements*."

*Id.* at S-2.  These statements create no binding legal requirement on the States—even though the

EPA "expects" (which is the strongest verb used in the Bay TMDL) the States will engage in

offset and trading programs, ultimately, it is in the individual States' control whether or not to

use offsets and trades as a method of complying with the Bay TMDL.  Nothing in the Bay

TMDL commands or requires States to engage in offsetting or trades, making this case similar to

*Cntr. for Auto Safety* and *Nat'l Ass'n of Home Builders*, where the relevant agency language was

voluntary and not mandatory.  To be sure, a State has limited options if it wishes to implement

the Bay TMDL, continue to comply with the CWA, accommodate population growth, and

encourage economic expansion.  But limited options does not mean no options.  EPA's

---

the States and the EPA, and the lead-up to the establishment of the Bay TMDL, the EPA
expected that the States would carry out the offset and trading programs, as the States themselves
pledged to do in their various WIPs.  The States have limited options if they hope to (1)
implement the Bay TMDL, (2) comply with the CWA, and (3) accommodate population growth
and support economic expansion.  EPA's "expectation," then, is just an acknowledgement of that
difficult reality.

encouragement that one option might be the most logical one does not command a State to implement it.

Moreover, the EPA's language cannot be mandatory because the CWA does not confer on the EPA the authority to command or to require the States to take specific actions, with respect to their implementation plans. The supplemental authority submitted by the defendants serves them well on this point. *See American Farm Bureau*, 2013 WL 5177530, at \*20 ("EPA is not authorized to establish or otherwise take over TMDL implementation plans."). The district court in that case found that while "it would go too far to say that EPA has no role in developing state implementation plans . . . EPA [does not have the] authority to enact its own implementation plan where it has determined that the state's effort has fallen short. EPA may not, for example, dictate to a state what measures the state must undertake to reduce pollution from a particular source." *Id.*[18]

There are two other reasons why the Bay TMDL document's references to offsets and trading do not constitute final agency action. First, such references do nothing to change the legal landscape, contrary to the plaintiffs' arguments that the 2010 TMDL marks "formal legal authorization by the EPA" of offsets and trading programs. *See* Pl.'s Mot. to Dismiss 9. The EPA approved of such methods for regulating water quality no later than 2003 and States have been engaging in such practices since then. *See generally* Final Water Quality Trading Policy 2 ("the policy is intended to encourage voluntary trading programs that facilitate implementation of TMDLs, reduce the costs of compliance with CWA regulations, establish incentives for

---

[18]     Importantly, *American Farm Bureau* is the only case to date that has analyzed the Chesapeake Bay TMDL in depth. In a thorough opinion, the court found that "the record, when viewed as a whole, does not support a finding that the framework of federal and state interaction was coercive in nature so as to render the TMDL an unlawful federal implementation plan." *American Farm Bureau*, 2013 WL 5177530, at \*30.

voluntary reductions, and promote watershed-based initiatives"); *see also* A Summary of U.S. Effluent Trading and Offset Projects, *supra* p. 19. Thus, the EPA's statements that it "expects" and "encourages" trading programs to occur does absolutely nothing new. *See Cntr. for Auto Safety*, 452 F.3d at 811 ("if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purposes of judicial review under the APA" (citation omitted)); *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 428 (D.C. Cir. 2004) ("By *restating* EPA's established interpretation of the certificate of conformity regulation, the EPA Letter [did not] tread . . . new ground. It left the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy."). If the Bay TMDL document was entirely silent about offsets and trading, the legal landscape would not change. In light of the fact that the EPA has not imposed any new legal obligation on any actor, the fact that it still "expects," or "encourages" States to engage in certain behavior has no practical, legally-binding effect on the States whatsoever—because they were engaging in trades and offsets before the TMDL came into being, and can do so even without the statements contained in the TMDL.[19]

---

[19]    The plaintiffs rely extensively on *Natural Res. Def. Council v. E.P.A. ("NRDC")*, 643 F.3d 311 (D.C. Cir. 2011) and *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015 (D.C. Cir. 2000). Those cases are distinguishable from the present action. In *NRDC*, the court found that an EPA Guidance Document was a final agency action because it "altered the legal regime" by resolving a question of statutory interpretation of the Clean Air Act. 643 F.3d at 320. That is not the case here because as set forth above, the EPA's language regarding offsets and trades does not alter the legal regime—that regime was in place before the Bay TMDL was established, is not binding on the States, and does not resolve a question of statutory interpretation. Meanwhile, in *Appalachian Power*, the court found that a Guidance Document was a final agency action because it "reads like a ukase. It commands, it requires, it orders, it dictates." 208 F.3d at 1023. The *Appalachian Power* court further found that "EPA has given States their 'marching orders' and EPA expects the States to fall in line . . . ." *Id*. That is not the case here, where, as set forth above, the language the EPA uses is permissive, not obligatory (nor, as set forth above, could it be under the CWA). Even though the EPA does "expect" that states will engage in trading and offset programs, in the context of the CWA, such an expectation is acknowledgment of the

In addition, this court has found that where agency action requires separate implementation plans to make its goals come to fruition, such agency action is not final for purposes of judicial review. *See, e.g.*, *Fund for Animals v. Williams*, 391 F. Supp. 2d 132, 139 (D.D.C. 2005) ("In sum, the FWS' publication of the Strategic Plan is not a final agency action because it does not mandate the creation or expansion of hunting opportunities and has no direct effect on those regulated. Because *actual implementation* of the goals announced in the Strategic Plan *occurs at a subsequent stage of decision[-]making*, judicial review of the Plan would prematurely interfere with the agency's decision[-]making process and would improperly substitute the court's discretion for that of the agency." (emphasis added)); *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 357 F. Supp. 2d 225, 229 (D.D.C. 2004), *aff'd on other grounds*, 460 F.3d 13 (D.C. Cir. 2006) ("Because further decision[-]making on the part of the BLM's state offices is required prior to any implementation of the Strategy's goals or guidelines, the Court concludes that the Strategy, simply stated, is not a final agency action. So, despite the fact that any decision[-]making process related to setting the Strategy may in fact be 'final,' it is not the type of decision that will directly affect the parties because further agency action is necessary before any concrete action will be taken by the agency that might affect the rights of the plaintiffs."). Similarly here, there are other actors—state agencies—that must implement the TMDL established by the EPA. The plaintiffs' rights will not be affected until further implementation by the States begins to take shape. Thus, the EPA setting forth its "expectations" is the starting point, and the States end up with the final decision as to whether to

---

limited options available, but imposes no binding obligation on the States, who are free to implement their respective TMDLs in whatever way they see fit (as long as their plans comport with the Bay TMDL itself and the CWA). In contrast, in *Appalachian Power*, the Guidance Document at issue interpreted certain provisions of the *Clean Air Act* that imposed various "requirements" on the States in the document itself. *Id.* at 1019-22 (explaining that "periodic monitoring [by States] *is required* for each emission point . . . ." (emphasis added)).

implement trading or offset programs and, if so, whether to approve a specific trade or offset when it approves a new or modified permit. Any final agency actions, then, that could potentially injure the plaintiffs' members are in the future—i.e., down river from this point in time.

## IV.  CONCLUSION

The plaintiffs want the Bay TMDL statements about offsets and trading to be declared null and void. But the plaintiffs can only mount such a challenge if such statements constitute (1) final agency action, and (2) if plaintiffs can show they have standing to challenge them. The plaintiffs cannot do that, and as such the Court must dismiss their action for lack of subject matter jurisdiction and for failure to state a claim.

For the foregoing reasons, the defendants' motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim are granted. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  December 13, 2013                                     RUDOLPH CONTRERAS
                                                                              United States District Judge